**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARTIE DEAL, | ) | CASE NO. 1:25-CV-1494 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Artie Deal's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Mr. Deal seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consents and Order, ECF No. 7.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Mr. Deal's application for benefits.

## II.    PROCEDURAL HISTORY

In June 2023, Mr. Deal applied to the Social Security Administration (SSA) seeking DIB and SSI.[1] (Tr. 230, 234.) He claimed that he became disabled on May 26, 2023. (*Id.*) He identified

---

[1] The administrative transcript appears at ECF No. 9. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 25"). It will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 1214").

two allegedly disabling conditions: (1) degenerative disc disease of the lower back; and (2) arthritis of the back and right hip. (Tr. 263.)

The SSA denied Mr. Deal's application initially and upon reconsideration. (Tr. 111, 113, 119, 120, 126–27.) Mr. Deal requested a hearing before an administrative law judge ("ALJ"). (Tr. 149.) Mr. Deal's counsel submitted a letter–brief in advance of the hearing. (Tr. 342–51.) The ALJ held a hearing on May 10, 2024, at which Mr. Deal was represented by counsel. (Tr. 87–106.) An independent vocational expert also testified at the hearing. (*Id.*)

On June 21, 2024, the ALJ issued a written decision finding that Mr. Deal is not disabled. (Tr. 8–25.) Mr. Deal requested review of the ALJ's decision. (Tr. 227–28.) The Appeals Council denied review in May 2025. (Tr. 1.)

On July 17, 2025, Mr. Deal filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Deal asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ erred when she discounted the results of the physical capacity examination that the Claimant underwent at the Cleveland Clinic.

> **Second Assignment of Error:** New evidence, which was highly probative, relevant, and specific, was rejected by SSA causing error, and requiring remand.

(Pl.'s Merit Br. at 10, 15, ECF No. 7, PageID# 1214, 1219.)

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

Mr. Deal was born in July 1978 and was 45 years old on the date of his application. (*E.g.*, Tr. 234.) He graduated high school. (Tr. 91, 264.)

Mr. Deal last worked in May 2023; he was a machine operator and order filler for a manufacturing company. (Tr. 93.) After being medically limited, he ended up in a seated position

2

where he untangled and packed springs. (*Id.*) Ultimately, he took short-term disability and FMLA leave. (*E.g.*, Tr. 104.) He has also worked a job packaging produce at a farm business for transportation to grocery stores. (Tr. 94.)

Mr. Deal lives alone. (Tr. 91.) He is able to drive, but at the time of the hearing he did not have access to a car. (Tr. 91–92.) He has two children, including a young daughter who visits. (Tr. 98, 231.)

### B. Pain Questionnaire and Function Reports

In June 2023, Mr. Deal submitted an undated pain questionnaire as part of his application for benefits. (Tr. 268–71.) He wrote that he has a "burning, sharp, aching" pain in his lower back, right hip, and feet for 24 hours each day. (*Id.*) The pain is "mostly severe" and is made worse by standing, walking, sitting, and bending. (*Id.*)

Mr. Deal wrote that his pain causes extreme fatigue, making it harder for him to focus on work activities and instructions. (Tr. 270.) He is unable to "pick up [his] body," and he has severe pain when putting on socks, shoes, and pants. (*Id.*) He tried two sessions of physical therapy, which did not help his condition. (*Id.*)

In October 2023, Mr. Deal submitted a function report. (Tr. 281–91.) He again wrote that he has extreme pain when sitting, standing, and bending. (Tr. 281.) He has no trouble bathing (except for difficulty washing his feet), shaving, feeding himself, or otherwise seeing to his hygiene. (Tr. 285.) It takes him about 10 minutes to put on his socks and shoes. (*Id.*) Mr. Deal cooks for himself, making microwave meals as he does not have the energy to prepare full meals. (Tr. 286.) He is able to clean his one-bedroom apartment, but it takes him about three days to do so. (*Id.*)

Mr. Deal steps outside his apartment every day. (Tr. 287.) He is able to drive and go out alone. (*Id.*) He shops for groceries in the store once per month. (*Id.*)

Mr. Deal reads, but he is not able to read as much as he would like. (Tr. 288.) He speaks to others in person, on the phone, and through text messaging. (*Id.*) But he only does so around once per month, to ask others for money to help him. (*Id.*) He does not go out except to doctors' appointments and the grocery store. (*Id.*)

He wrote that he was "not sure" how long he could walk before needing to rest. (Tr. 289.) He can pay attention "all day" and follows instructions "perfect[ly]." (*Id.*) He gets along well with authority figures. (*Id.*)

Mr. Deal completed a second function report, which is not dated. (Tr. 292–300.) In addition to generally restating his complaints, he wrote that he has difficulty falling asleep and staying asleep, so he takes frequent naps. (Tr. 293.) His spinal injections have made it difficult to lay down or get comfortable. (*Id.*) He has difficulty reading because his pain makes it hard to focus. (Tr. 294.) Mr. Deal takes very quick showers to minimize the time spent on his feet. (*Id.*) Mr. Deal said he is "lucky" if gets out of the house once or twice a week. (Tr. 296.) He is in excruciating pain if he drives for longer than about 10 minutes. (*Id.*) When he shops, he leans on a cart for support. (Tr. 297.) Mr. Deal wrote that he can walk unassisted on a smooth, flat surface for 25 feet before he needs to rest for 10 to 15 minutes. (Tr. 299.) He has a lot of fear about falling. (Tr. 300.)

C.      **Relevant Hearing Testimony**

1.      *Mr. Deal's Testimony*

Mr. Deal testified that he experiences back and hip pain that can be so severe that he falls down. (Tr. 94.) The hip pain makes it difficult to walk. (*Id.*) When he bends over, it can be hard to stand back up. (*Id.*) On a good day, his pain is a seven out of ten; on a bad day, his pain is a "ten to a hundred." (Tr. 99.) He has eight or nine bad days a month. (*Id.*)

Mr. Deal testified that on a normal day, where he experiences normal pain, he can "basically function." (Tr. 91.) He wakes up, brushes his teeth, and microwaves food for himself. (Tr. 91–92.)

4

He will sit until he is in too much pain to sit any longer, after which he walks around or lays down in bed to relieve the pain. (Tr. 92.) He estimated that he returns to lay down in bed around 15 times a day. (*Id.*) When he lays down, he will watch television or read. (*Id.*) He finds himself constantly changing positions to be more comfortable. (*Id.*)

Mr. Deal has no problems bathing, but dressing is difficult because it is hard to lift his leg to put on socks and pants. (*Id.*)

A family member drives Mr. Deal to the store for groceries once a month. (Tr. 92.)

Mr. Deal does not visit with family; he uses his phone to communicate with others but does not see people in person. (Tr. 92–93.)

Mr. Deal was informed that he did not qualify for a vocational rehabilitation program because of the limited number of hours he could work. (Tr. 94.) Mr. Deal found that physical therapy was not helpful for him; he was not able to do the exercises they gave him. (Tr. 95.) He has undergone injections, but the relief from that treatment lasts for only a week. (*Id.*) He has tried baclofen and meloxicam, without relief. (*Id.*) He does not take any over-the-counter medicine. (*Id.*)

Mr. Deal testified that he was referred to a spine surgeon, and the surgeon advised that there was "such a small probability that surgery will help" that it was not worth the risks of that intervention. (Tr. 95–96.)

Mr. Deal said that he can stand for only five or six minutes at a time and walk for only 50 feet. (Tr. 96.) He uses a cane to get up from chairs and to get out of bed, but the cane was not prescribed. (*Id.*) He can sit for only about five minutes. (*Id.*)

Mr. Deal is able to reach for things in front of him, although it causes some pain. (Tr. 98.) He is able to grasp and hold onto objects, but he cannot pick up his young daughter and said there

was "no way . . . to keep up with her" when she visits. (*Id.*) He can sometimes reach for objects over his head. (*Id.*)

Mr. Deal is able to slowly climb stairs, but he sits and slides when coming down in case he falls. (*Id.*) He can kneel and crawl. (*Id.*)

### 2. *Vocational Experts' Testimony*

Lauren Petkoff testified as a vocational expert ("VE") at the hearing. (Tr. 99.) The VE characterized Mr. Deal's past relevant work of that of a packer (DOT 920.687-134), laborer (DOT 922.687-058), hand packager (DOT 920.587-018), and a composite job consisting of a material handler (DOT 929.687-030) and general inspector (DOT 609.684-010). (Tr. 101–02.)

The ALJ asked the VE to assume that a hypothetical individual with Mr. Deal's age, education, and work experience is capable of work at the light exertional level, with additional limitations. (Tr. 102.) Specifically, the person can occasionally climb ramps and stairs but cannot climb ladders, ropes, or scaffolds. (*Id.*) They can occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) They can occasionally reach overhead. (*Id.*) They can never work near unprotected heights or dangerous moving machinery. (*Id.*) They cannot engage in commercial driving. (*Id.*) They need a sit/stand option every hour that lasts for five minutes in the vicinity of the workstation. (*Id.*)

The VE testified that such a person could not perform Mr. Deal's past relevant work but could perform the work of an inspector and hand packager (DOT 559.687-074), router (DOT 222.587-038), or information clerk (DOT 237.367-018). (Tr. 102–03.)

The ALJ next asked the VE to limit the individual to work at the sedentary exertion level. (Tr. 103.) The VE testified that such a person could perform the work of a circuit board assembler (DOT 726.684-11), final assembler (DOT 713.687-018), or order clerk (DOT 209.567-014). (*Id.*)

6

The VE testified that employers will tolerate up to six unexcused absences per year. (*Id.*) Employers will tolerate an employee who is off task up to 15 percent of the workday. (Tr. 104.)

### D.  State Agency Consultants

A disability examiner (Heather Coey) and a physician (Steve McKee, M.D.) reviewed Mr. Deal's claim at the initial review level. (Tr. 107–13.)

Dr. McKee opined that Mr. Deal's statements about his pain were only partially consistent with the record. (Tr. 109.) Dr. McKee noted that Mr. Deal had osteoarthritis of the right hip and radiculopathy of the lumbar region, with a mildly antalgic gait and decreased flexion and extension of the spine. (*Id.*) But Dr. McKee wrote that his strength was symmetrical and, though mildly reduced on examination, "poor effort" was "noted" in the examination. (*Id.*)

Dr. McKee limited Mr. Deal to occasionally lifting and carrying up to 20 pounds and frequently up to 10 pounds. (*Id.*) He can stand and walk for six hours and sit with six hours in a normal workday. (Tr. 110.) Dr. McKee wrote that Mr. Deal must avoid ladders, ropes, and scaffolds, as well as kneeling, crouching, and crawling "due to hip and low back pain, antalgic gait and reduced strength." (*Id.*) He can occasionally balance and stoop and climb ramps and stairs. (*Id.*)

Based on this opinion, the consultants determined that Mr. Deal could perform the work of a furniture rental consultant (DOT 295.357-018), usher (DOT 344.677-014), or children's attendant (DOT 349.677-018). (Tr. 111.) The consultants therefore found that Mr. Deal was not disabled. (*Id.*)

In a letter explaining the decision to Mr. Deal, the agency wrote that it found that, despite his pain and discomfort, he is "still able to move about and use [his] arms, hands, legs and back to perform some less strenuous types of work-related activities." (Tr. 138.)

A disability examiner (Taylor Jenkins) and a physician (Mehr Siddiqui, M.D.) reviewed Mr. Deal's claim at the reconsideration level. (Tr. 114–20.)

Dr. Siddiqui opined that the July 13, 2023 medical opinion was not consistent with or supported by the record evidence, pointing out that a September 2023 MRI showed improvement and a physical examination revealed normal gait. (Tr. 115–17.) Dr. Siddiqui found that record evidence to be mostly consistent with the initial findings, which were "supported by the totality of the evidence that is on file." (Tr. 118.)

Based on this opinion, the consultants affirmed the initial findings and opined that Mr. Deal could perform the work of an assembler (DOT 734.687-018), stuffer (DOT 731.685-014), or patcher (DOT 723.687-010). (Tr. 118) The consultants affirmed that Mr. Deal was not disabled. (Tr. 119.)

In a letter to Mr. Deal, the agency wrote that he has severe physical conditions, including chronic low back pain, and "may experience symptoms such as pain or limited range of motion in your lower back." (Tr. 143.) But the agency wrote that the "records show a normal gait with recent improvements in your condition," such that he would be capable of performing light work activity. (*Id.*)

### E. Relevant Medical Evidence

MRI imaging from December 2020 revealed mild facet degenerative changes and a bulging annulus at the L4–L5 level. (Tr. 358.) There was also a bulging annulus with a migrating left paracentral disc extrusion at the L5–S1 levels. (*Id.*) The bulging disc abutted the descending left S1 nerve root. (Tr. 359.)

Mr. Deal consulted with Augusto Hsia, M.D., on January 10, 2022. (Tr. 357.) Dr. Hsia noted that Mr. Deal had complained of lower back pain since he was 15 years old. (*Id.*) Mr. Deal complained of low back pain that was "constant, achy, sharp" and worse with bending. (*Id.*) His

pain was a five out of ten. (*Id.*) On examination, straight leg examinations and contralateral straight leg raises were negative. (Tr. 361.) His gait was normal, and his strength was normal in the lower extremities. (*Id.*) His extension was restricted in the lumbar region, but his oblique extension and lateral bending were normal. (*Id.*) His hip range of motion was within normal limits. (*Id.*) Dr. Hsia referred Mr. Deal for physical therapy. (*Id.*)

X-ray imaging of the hips in January 2022 revealed "mild osteoarthritis" in the hips with "small collar osteophytes." (Tr. 364.)

When Mr. Deal followed up with a certified nurse practitioner in October 2022, he rated his pain as a seven out of ten. (Tr. 373.) The pain radiated to his groin. (*Id.*) On examination, there was no tenderness in the lumbar spine, which had normal range of motion. (Tr. 374.) Mr. Deal was instructed on alternating ice and warm moist heat and was prescribed a pack of methylprednisolone. (*Id.*)

Mr. Deal followed up with Dr. Hsia on July 11, 2023 (Tr. 384.) He said he was feeling worse pain in the low back, bilateral legs, and buttocks. (*Id.*) He described the pain as constant, achy, and worse with prolonged sitting and activity. (*Id.*) His pain was a seven out of ten. (*Id.*) On examination, Mr. Deal's gait was "mildly antalgic," although his posture and spinal curves were normal. (Tr. 387.) There was a palpable muscle spasm or lumbar paraspinal tenderness. (*Id.*) Flexion and extension of the lumbar spine were decreased. (*Id.*) Bilateral strength of the lower extremity muscles was 4 to 4.5 out of 5, even with "poor effort." (*Id.*)

An updated MRI in July 2023 revealed similar findings to his previous scan. (Tr. 1100.) There was "minimal lumbar spondylosis" noted, resulting in "up to mild spinal canal narrowing" at the L4–L5 level and "mild neural foraminal narrowing" at the L5–S1 levels. (*Id.*) The disc

extrusion noted in the previous scan was "mildly decreasing in size" and no longer contacted the descending nerve root. (*Id.*)

Mr. Deal continued to report similar symptoms at a follow-up appointment in 2023, with similar physical examination findings. (Tr. 416, 419 (gait is normal).)

Mr. Deal underwent a physical capacity evaluation with physical therapist James McDonald on July 13, 2023. (Tr. 382.) Mr. McDonald noted that there was segmental inconsistency of effort, resulting in "mild sub-maximal effort." (*Id.*) He wrote that Mr. Deal may have considered pain while making functional decisions. (Tr. 382–83.)

Mr. McDonald opined that Mr. Deal can perform work at the light exertional level. (Tr. 283.) He can work part time for up to 2 hours 39 minutes per day, but he needs to alternate sitting and standing. (*Id.*) He can occasionally bend, engage in fine manipulation, pinch, grasp, and walk. (*Id.*) He should avoid over shoulder reaching, static balance, firm grasping, squatting, and stairs. (*Id.*)

Dr. Hsia, in reviewing Mr. Deal's most recent MRI, wrote that he did not see an urgent need for surgery. (Tr. 1088.) He ordered a repeat spinal injection and instructed Mr. Deal to engage in physical therapy after the injection. (*Id.*)

Mr. Deal consulted with Phillip Mendis, D.O., on August 23, 2023, for the injections. (Tr. 582.) Mr. Deal complained of pain at an eight out of ten. (*Id.*) On examination, Mr. Deal had four of five bilateral hip flexion and knee extension. (Tr. 583.) He had better than four out of five extension and flexion of the bilateral extensor hallucis longus muscles. (*Id.*) He had full neck flexion and extension. (*Id.*)

Mr. Deal asked Dr. Hsia over an electronic message in August 2023 whether he could return to work for two hours per day. (Tr. 565.) Dr. Hsia responded that he would have to examine Mr.

Deal in the office and was hopeful that they could "even consider a few more hours of work," but it would be difficult to approve that over solely electronic messages. (*Id.*)

When Dr. Hsia saw Mr. Deal in September 2023, Dr. Hsia approved Mr. Deal to work two and a half hours per day. (Tr. 1056.) His physical examination was unchanged. (*Id.*)

When Mr. Deal followed up with Dr. Hsia in September 2024, Mr. Deal reported that his previous employer did not approve light duty. (Tr. 76.) Mr. Deal complained of continued constant pain at an eight out of ten. (*Id.*) He said his legs were constantly numb. (*Id.*) On examination, he had a normal gait. (Tr. 80.) Flexion and extension of the lumbar spine were still decreased. (*Id.*) He had decreased patellar and Achilles reflexes. (Tr. 80–81.) His lower extremity strength remained 4.0 to 4.5 out of 5.0. (*Id.*)

Mr. Deal submitted several medical opinions and records after the ALJ rendered her decision in this matter, which are summarized here to the extent they are relevant to Mr. Deal's second assignment of error.

Mr. Deal asked Dr. Hsia in January 2025 for an electromyography study to support his disability application, but Dr. Hsia informed him that the study may not be helpful to his case; the test would likely come back normal in the circumstance of chronic sensory nerve pain without significant motor defects or active compression. (Tr. 83.)

Dr. Hsia wrote a letter dated May 15, 2025. (Tr. 46.) Dr. Hsia wrote that Mr. Deal's most recent MRI showed some radiologic improvement, but his leg pain was due to chronic permanent nerve damage. (*Id.*) Dr. Hsia wrote that he has "clear objective evidence of his disability" from the July 2023 functional capacity evaluation, and he opined that Mr. Deal's weakness was "attributed to high pain levels rather than malingering behaviors." (Tr. 46–47.) Dr. Hsia wrote that Mr. Deal was unable to return to work "in any capacity . . . beyond sedentary/light work." (Tr. 47.)

Dr. Hsia also provided a medical source statement of functional capacity that he completed on May 14, 2025. (Tr. 49.) Relying on the July 2023 functional capacity evaluation, Dr. Hsia opined on a number of restrictions consistent with that opinion. (Tr. 48–49.)

## IV.    THE ALJ'S DECISION

The ALJ found that Mr. Deal meets the insured status requirements of the Social Security Act through December 31, 2028. (Tr. 13.) The ALJ further found that Mr. Deal had not engaged in substantial gainful activity since May 26, 2023, the alleged onset date. (*Id.*)

The ALJ next determined that Mr. Deal had the following severe impairments: (1) degenerative disc disease of the lumbar spine with disc bulge; and (2) osteoarthritis of the bilateral hips. (Tr. 14.)

The ALJ noted that Mr. Deal also had a non-severe impairment of a right renal cyst. (Tr. 14.)

The ALJ then concluded that none of Mr. Deal's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Deal had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 15.)

With respect to exertional and environmental limitations, Mr. Deal requires a "sit/stand" option every hour, which lasts for five minutes at the workstation. (*Id.*) He can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds. (*Id.*) He can occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) He can occasionally reach overhead. (*Id.*) He must never be exposed to unprotected heights or dangerous machinery. (*Id.*) He cannot operate a motor vehicle. (*Id.*)

The ALJ found that Mr. Deal was unable to perform his past relevant work as a laborer,

12

hand packager, packer, or the composite work of a material handler and general inspector. (Tr. 23.)

The ALJ concluded that Mr. Deal had at least a high school education and was 44 years old on the alleged disability onset date. (*Id.*)

The ALJ then determined that—considering Mr. Deal's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as an "inspector and hand packager" (DOT 559.687-074), "router" (DOT 222.587-038), and "information clerk" (DOT 237.367-018). (Tr. 24.) The ALJ therefore found that Mr. Deal was not disabled. (Tr. 25.)

## V.     LAW & ANALYSIS

### A.     <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards.

13

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.    **Standard for Disability**

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims for both DIB and SSI follows a five-step review process. 20 C.F.R. § 404.1520.[2] First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b).

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (e.g., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at \*5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at \*17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which

he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

### C.    Analysis

#### 1.    The July 2023 Physical Capacity Evaluation

In his first assignment of error, Mr. Deal contends that the ALJ's conclusions with respect to Mr. McDonald's July 2023 functional capacity opinion were not supported by substantial evidence. Mr. Deal argues that the ALJ "devalued a reliable and highly relevant functional capacity test," pointing out that the test was performed in a clinical setting and insisting that the test "is the most objective measure of Mr. Deal's physical functioning contained in the record." He further argues that the results of the test are consistent with Mr. Deal's treating records and Dr. Hsia's 2025 medical opinion letters.

The ALJ discussed Mr. McDonald's opinion evidence as follows:

> On July 13, 2023, the claimant underwent functional capacity evaluation (FCE) with James McDonald, PT, of CCF Lutheran Hospital. During evaluation, the claimant lifted 15 pounds to below waist height and 10 pounds to shoulder height, carried 15 pounds, pushed 17 horizontal force pounds, and pulled 22 horizontal force pounds. However, the claimant put forth submaximal effort. Mr. McDonald concluded the claimant can perform light work, and may be able to work part time for up to 2 hours and 39 minutes per day while taking into account his need to alternate sitting and standing. He opined the claimant can perform occasional bending, fine coordination, gross coordination, pinching, simple grasping, and walking,

16

and frequent forward reaching, and must avoid above shoulder reaching, static balancing, firm grasping, squatting, and stair climbing.

. . .

This opinion is not fully persuasive for several reasons. First, the opinion is inadequately supported, because despite examination findings of lifting 10 to 15 pounds and carrying only 15 pounds, the opinion was based on a one-time evaluation of the claimant during which the claimant put forth sub-maximum effort.

Additionally, the opinion is inconsistent with the remaining evidence of record, including examination findings of lumbar tenderness, muscle spasm, and decreased range of motion, decreased lower extremity strength, occasionally decreased reflexes, and an occasionally abnormal gait, but normal cervical range of motion, normal cardiovascular and respiratory findings, intact sensation, generally normal reflexes, normal muscle tone, negative straight leg raising and Faber's testing, and consistently independent ambulation, and no indication of impaired upper extremity strength or coordination on examination.

Furthermore, the opinion, especially a restriction to working less than 3 hours per day, is inconsistent with subsequent MRI testing of the lumbar spine, which revealed only minimal lumbar spondylosis resulting in mild spinal canal narrowing at L4-5 and mild neural foraminal narrowing at L5-S1, as well as decreased focal disc extrusion at L5-S1 no longer contacting the S1 nerve root. Because the record as a whole confirms greater functional capacity, Mr. McDonald's opinion is not fully persuasive.

(Tr. 17–18, 21–22) (citations to the record omitted) (line breaks added for readability).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c).

Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1).

17

Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)).

The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Here, Mr. Deal seems to concede that the ALJ discussed both supportability and consistency when addressing Mr. McDonald's functional capacity opinion. But he argues that the ALJ's conclusion that the evaluation was less than fully persuasive was not supported by substantial evidence.

First, Mr. Deal argues that the ALJ erred by finding that his "sub-maximum effort" rendered Mr. McDonald's findings less than fully persuasive. Mr. Deal points out that Mr. McDonald assessed that his sub-maximum effort may have been due to pain. He argues that the ALJ's failure to specifically acknowledge how pain may have affected his ability to put forth maximum effort fails to build a logical bridge between the evidence and result.

18

The Commissioner asks the Court to consider the context of the ALJ's remark. The ALJ, in discussing supportability, found Mr. McDonald's opinion to be less than fully persuasive because it was based on a "one-time evaluation" during which Mr. Deal did not put forth maximum effort. The Commissioner further points out that the sub-maximum effort was one factor among many for the ALJ's conclusions, such that the remark was "not dispositive."

Mr. Deal next argues that the ALJ's reference to "normal cervical range of motion, normal cardiovascular and respiratory findings, intact sensation, generally normal reflexes, normal muscle tone, negative straight leg raising and Faber's testing, and consistently independent ambulation" was misplaced because some of those findings—like normal respiratory findings—are "completely unrelated" to the lumbar back issues that cause his functional limitations. Mr. Deal says that the ALJ did not focus enough on his ability sustain substantial gainful activity in light of his chronic low back pain and functional limitations to his ability to walk, stand, and lift.

The Commissioner points out that the ALJ made this reference in addition to specifically discussing other findings specific to Mr. Deal's low back, including the MRI showing "minimal" or "mild" abnormalities and improvement from the previous MRI. The Commissioner further casts the ALJ's statement as a reasonable observation in light of Mr. McDonald's opinion that Mr. Deal can work less than three hours per day; it "reflects that the ALJ fully and carefully weighed the evidence" in drawing her conclusions.

Finally, Mr. Deal notes that the ALJ acknowledged that the record showed "lumbar tenderness, muscle spasm, decreased range of motion, decreased lower extremity strength, occasionally decreased reflexes, and an occasionally abnormal gait." Mr. Deal argues that this evidence is consistent, rather than inconsistent, with Mr. McDonald's findings.

19

The Commissioner responds that the ALJ appropriately gave "some credence" to Mr. McDonald's opinion, limiting Mr. Deal to light work, for example. The Commissioner contends that the ALJ adequately weighed the evidence and her conclusions are supported by substantial evidence.

After careful consideration, the Court agrees with the Commissioner that the ALJ's conclusions with respect to Mr. McDonald's opinion are supported by substantial evidence.

It is true that courts have found reversible error where an ALJ discounted a medical opinion based solely on poor effort, where the opinion itself suggests that the inconsistent effort was explained by pain and where the ALJ also failed to consider the opinion in the context of other evidence in the record. *See Brown v. Comm'r of Soc. Sec.*, No. 21-cv-01042, 2022 WL 2833810, at *3 (N.D. Ohio). But that is not the case here.

As an initial matter, Mr. McDonald did not opine on whether Mr. Deal's complaints of pain were reliable; he stated only that pain "could have been considered while making functional decisions." (Tr. 382–83); *see also Fair v. Comm'r of Soc. Sec.*, No. 1:21-CV-00893-CEH, 2022 WL 1802977, at *6 (N.D. Ohio June 2, 2022) (holding that the same observation was not a statement that pain complaints were reliable).

Courts have held that an ALJ's opinion is adequately supported where the ALJ notes that the evaluator's opinion was based on a one-time examination wherein the claimant displayed sub-maximal effort. *E.g.*, *Fair*, 2022 WL 1802977, at *6. That is the case here.

Moreover, the Court notes that Mr. McDonald's observation about self-limiting behavior is consistent with Dr. Hsia's records, which consistently note a "yellow flag" that Mr. Deal was avoiding activity for fear of pain. (*E.g.*, Tr. 359, 385, 417; *see also* Tr. 1056 (planning for "activity modification counseling")).

20

This was also not the only reason for the ALJ's conclusion. The ALJ also noted that the opinion was inconsistent with the MRI imaging, which revealed minimal spondylosis, only mild abnormalities, and improvement in that the disc extrusion was no longer contacting the nerve root. The Court finds no reversible error in the ALJ's discussion of normal findings related to Mr. Deal's other body systems. In context, it is clear that the ALJ was making the point that Mr. McDonald's opinion was inconsistent with relatively mild low-back conditions and could not be otherwise explained by reference to Mr. Deal's neck, cardiovascular system, or any other body system. Moreover, contrary to Mr. Deal's suggestion to the contrary, several of the ALJ's references to inconsistencies are directly related to Mr. Deal's low back pain and related limitations. The ALJ pointed to intact sensation, generally normal reflexes, negative straight leg raise tests, negative FABER testing, and independent ambulation in concluding that Mr. McDonald's opined significant limitations were not fully persuasive.

The Court finds that this is substantial evidence to support the ALJ's conclusion that the functional capacity evaluation was inconsistent with the medical record.

The Court also disagrees with Mr. Deal that the ALJ's accurate acknowledgement of "examination findings of lumbar tenderness, muscle spasm, and decreased range of motion, decreased lower extremity strength, occasionally decreased reflexes, and an occasionally abnormal gait" is somehow a distortion of the evidence. To the contrary, it reflects that the ALJ reasonably found that Mr. Deal does have some functional limitations stemming from his lumbar back condition. The ALJ proceeded to find that the limitations are not as *severe* as Mr. McDonald opined. The ALJ's discussion of evidence supportive of Mr. Deal's position simply reflects a weighing of the evidence.

Before concluding, the Court notes that it is unconvinced by Mr. Deal's suggestion that the ALJ found the state consultants' opinions more persuasive than Mr. McDonald's, when the consultants did not examine Mr. Deal at all. The consultants' opinions were based on a thorough review of his medical records, and the consultants provided specific references to that record in making their opinions. The ALJ did not err in taking that into account when determining supportability. *See Fair*, 2022 WL 1802977, at *6.

The ALJ discussed both supportability and consistency when considering Mr. McDonald's opinion, and substantial evidence supports the ALJ's conclusion that the opinion was not fully persuasive.

Accordingly, Mr. Deal's first assignment of error is overruled.

### 2.      The Post-Decision Evidence

In his second assignment of error, Mr. Deal contends that the SSA erred in not considering evidence submitted between when the ALJ issued her decision and when the Appeals Council affirmed that decision—specifically Dr. Hsia's May 2025 letter and accompanying medical source statement. (Tr. 46–49.) Mr. Deal asks the Court to reverse the ALJ's decision and remand with instructions to consider the new evidence.

It is not clear when Mr. Deal submitted this evidence to the Agency. Dr. Hsia's letter is dated May 15, 2025, four days before the Appeals Council issued its decision. (Tr. 46, Tr. 1.) But the letter bears a facsimile header stamp seemingly indicating that the letter was faxed to someone on May 28, 2025, which would have been after the Appeals Council issued its decision. (*See* Tr. 46.) The Appeals Council's letter to Mr. Deal does not specifically mention Dr. Hsia's May 2025 records. (*See* Tr. 2.)

22

But the parties seem to both represent that the evidence was submitted prior to the Appeals Council's decision. Mr. Deal represents that the evidence was "admitted into the record subsequent to Mr. Deal's disability hearing." (ECF No. 10-1, PageID# 1219.) The Commissioner states that the evidence "was submitted to the Appeals Council after the ALJ had already rendered her decision." (ECF No. 12, PageID# 1232.) For purposes of considering this assignment of error, and based on the parties' representations, the Court will assume that Mr. Deal timely submitted these records for review before the Appeals Council.

Where the SSA Appeals Council considers post-decision evidence but declines to review a claimant's application for benefits on the merits, a district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1998) (citing *Cotton v. Sullivan*, 2 F.3d 692, 695–96 (6th Cir. 1993)). But the court can issue a Sentence Six remand if the claimant shows that "the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Id.* The claimant must show both materiality and good cause. *Id.* at 149.

Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)). Evidence is "material" if there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* And a claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the ALJ's hearing. *See id.*

Here, there seems to be no dispute that Dr. Hsia's May 2025 letter and accompanying medical source statement were "new." Dr. Hsia completed both in May 2025, and they were

23

therefore not in existence at the time of the ALJ's hearing in May 2024. But Mr. Deal has not met his burden to show "good cause" for failing to present the evidence for inclusion at the hearing, and he has further failed to show that the evidence is "material."

While Dr. Hsia completed the functional capacity form and wrote his supportive letter in May 2025, he relied heavily on Mr. McDonald's July 2023 functional capacity evaluation in coming to the conclusions expressed therein. Dr. Hsia summarized Mr. McDonald's evaluation findings (Tr. 46.) Then Dr. Hsia wrote that Mr. Deal "has clear objective evidence of his disability *from functional capacity evaluation*." (Tr. 47) (emphasis added). Dr. Hsia completed his own medical source statement, but he adopted Mr. McDonald's opinion and in every circumstance specifically identified Mr. McDonald's evaluation as the medical support for Dr. Hsia's own opinion. (*See* Tr. 48–49.)

Dr. Hsia did write that he last saw Mr. Deal in September 2024, but he did not clearly describe how Mr. Deal's condition had worsened between May 2024 and May 2025, such that his condition was materially different than it was at the hearing. (*See* Tr. 46.) Dr. Hsia wrote that Mr. Deal had been unable to work due to exacerbations, and that there was "little response to epidural steroid injections and multiple pharmacologic treatment." (*Id.*) But Dr. Hsia's medical note from his September 2024 does not reveal significant changes; Mr. Deal's complaints and the physical examination were largely unchanged from previous appointments. (*See* Tr. 76, 80–81.) The visit focused on Mr. Deal's disability application, with Dr. Hsia noting that his disability application had been denied and that he would fill out new paperwork in support of the application. (*See id.*) There were no significant changes to Mr. Deal's treatment plan, which included that he consider starting physical therapy again, use ibuprofen as needed, and obtain activity modification counseling. (Tr. 81.) When Mr. Deal contacted Dr. Hsia in January 2025, the contact again focused

24

on the disability application, with Mr. Deal wanting an EMG study and Dr. Hsia expressing the opinion that the test would be negative for him "and will not help his case." (Tr. 74.)

In other words, Dr. Hsia's observations and opinions—although expressed in 2025—were generally consistent with his own medical records and Mr. McDonald's functional capacity evaluation from before the ALJ's hearing. There is no apparent reason why the sort of additional information provided by Dr. Hsia could not have been obtained before the hearing. *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 277 (6th Cir. 2010). Mr. Deal does not offer any explanation, other than a change in counsel, for the failure to procure these opinions for use at the hearing. His then-counsel did not raise an issue at the hearing that there was more evidence to acquire. And he had over a month between the hearing and the ALJ's decision to obtain this new information.

Under these circumstances, Mr. Deal has not shown a reasonable justification for the failure to acquire and present the evidence for inclusion in the ALJ's hearing decision.

Mr. Deal has also failed to carry his burden with respect to materiality.

As noted above, while Dr. Hsia briefly recounted his own treatment history with Mr. Deal, his actual functional limitation opinions were based almost entirely (if not entirely) on Mr. McDonald's July 2023 capacity evaluation. He relied entirely on Mr. McDonald's opinion to support his answers on his own medical source statement regarding Mr. Deal's physical capacity. (Tr. 48–49.) He did not specifically identify any other objective medical evidence in support of his opinions, beyond generally summarizing the treatment history. Mr. Deal insists that Dr. Hsia's willingness to embrace Mr. McDonald's evaluation, and Dr. Hsia's statement that the sub-maximal effort was due to pain and not malingering, the Court finds it difficult to see how there could be a "reasonable probability" that what amounts primarily to Dr. Hsia's summary of another provider's earlier evaluation would have caused the SSA to reach a different disposition of Mr. Deal's claim.

Under these circumstances, the Court does not find Dr. Hsia's May 2025 letter and medical source statement to be material, nor does the Court find good cause for Mr. Deal's failure to procure the opinions in time for them to have been considered by the ALJ.

Accordingly, Mr. Deal's second assignment of error is overruled.

## VI.    CONCLUSION

Having overruled Mr. Deal's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.


Dated:  May 18, 2026                                    /s/ *Jennifer Dowdell Armstrong*
                                                        Jennifer Dowdell Armstrong
                                                        U.S. Magistrate Judge

26